UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jennifer M. Countryman,

        Plaintiff,

v.

Nordstrom, Inc.,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
Civ. No. 05-2588 ADM/JSM

_____

Stephen M. Thompson, Esq., Friederichs & Thompson, P.A., Bloomington, MN, argued on behalf of Plaintiff.

Andrew E. Tanick, Esq., Rider Bennett, LLP, Minneapolis, MN, argued on behalf of Defendant.

_____

## I. INTRODUCTION

On December 1, 2006, oral argument before the undersigned United States District Judge was heard on Defendant Nordstrom, Inc.'s ("Nordstrom") Motion for Summary Judgment [Docket No. 15]. In her Complaint [Docket No. 1], Plaintiff Jennifer M. Countryman ("Countryman") asserts claims for disability discrimination and failure to make reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), (b)(5)(A), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subds. 2, 6. For the reasons stated herein, Nordstrom's Motion for Summary Judgment is denied.

## II. BACKGROUND[1]

Jennifer Countryman was an employee of Nordstrom at its Mall of America store from

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

February 2000 to September 16, 2004. Countryman Dep. (Flom Aff. [Docket No. 23]; Tanick Aff. [Docket No. 19] Ex. A) at 57, 118. Prior to her diabetes diagnosis, Countryman's performance reviews were largely positive. Countryman Dep. at 124-31; Flom Aff. Ex. 1. On April 1, 2004, Countryman, at the age of twenty-five, was diagnosed with Type I diabetes. Countryman Dep. at 10; Countryman Aff. [Docket No. 22] ¶¶ 4-5. She took a one month leave of absence from work upon learning of her diagnosis. Countryman Dep. at 151; Countryman Aff. ¶ 6. At her deposition, Countryman described struggling at first with learning to live with diabetes. Countryman Dep. at 107. She experienced hypoglycemia, with symptoms including shakiness, dizziness, hunger, and speech problems, and hyperglycemia, with symptoms including frequent urination, fatigue, thirst, and ketones in her urine. Countryman Aff. ¶ 7. She was prescribed insulin, and was told by her doctors that it would take some time to determine her correct dosage of insulin, requiring her to call her doctors every day for a period of time to report her glucose readings so adjustments to her insulin levels could be made. Id.; Countryman Dep. at 11.

Countryman had insulin reactions at work, which included symptoms such as feeling very hot, shaky, and overwhelmed. Countryman Dep. at 101. She described it as, "If you have ever been really hungry, it's kind of like that, but amplified by about ten." Id. She treated her reactions by drinking juice, or coffee with sugar. Id. at 101-02. She needed to take frequent breaks to test her blood sugar, use the bathroom, get something to eat or drink, and rest. Id. at 124, 156-57. At various times, Countryman's diabetes affected her life activities of eating, sleeping, walking, speaking, standing, thinking, and interacting with others. Id. at 167-79; Countryman Aff. ¶ 9. She also testified that insulin attacks would disable her for fifteen to thirty

minutes at a time, and that she would have insulin attacks once a week or once every two weeks.[2] Countryman Dep. at 104, 107.

Upon her return to work in the Hosiery Department at Nordstrom, Countryman informed her supervisor, Bliss Van Guilder ("Van Guilder"), and Sandi Shadron ("Shadron") in the Human Resources Department of her diabetes diagnosis and her need to take breaks to use the bathroom, test her blood sugar, and eat and drink to treat hypoglycemia when it occurred. Id. at 182; Countryman Aff. ¶ 8; Shadron Dep. (Flom Aff.) at 26-27.[3] In June 2004, Keri Smasal ("Smasal") replaced Van Guilder as Countryman's supervisor. Countryman Dep. at 183. Countryman informed Smasal right away of her diabetes and her need to take frequent breaks. Id. at 135-36, 183-84; Smasal Dep. at 53-54. Countryman often worked alone in the small Hosiery Department, and so Smasal told her that if she needed to take a break, she should ask someone from a nearby department to cover for her. Countryman Dep. at 136. Countryman also told Smasal of her need to eat lunch at the same time every day, and Smasal tried to schedule Countryman's lunch break accordingly. Id. at 158-59. In August 2004, Countryman told Smasal that she wanted to be working with people on the floor at all times. Id. at 212. Smasal said she

---

[2] In her affidavit, Countryman stated that during the time period in question, she would experience "lows" approximately three times per week and "highs" approximately one to two times per week, which affected her ability to sleep, speak, interact with others, stand, and think. Countryman Aff. ¶ 9. Nordstrom argues that Countryman's affidavit contradicts her deposition testimony, and should not be considered. Countryman argues that Nordstrom is taking her deposition testimony out of context, and that her deposition answer regarding frequency of insulin attacks was in response to a question about limitations due to diabetes that she experienced after her employment with Nordstrom. The Court finds that Countryman's affidavit is not contradictory but is to amplify and clarify Countryman's testimony at her deposition and may be considered.

[3] Countryman was already entitled to two fifteen-minute breaks per shift. Smasal Dep. (Flom Aff.) at 84.

3

was going to be hiring new employees.  Id.  However, Countryman can not recall the name of the woman hired on a limited part-time basis, whom Countryman worked with "very little."  Id. at 212-13.

On August 7, 2004, Countryman experienced an insulin low while assisting a customer.  Id. at 36-37.  She does not remember exactly what happened, but she knows that her hands were shaking and she was panicking, and she feels she may have "exploded on" the customer.  Id. at 36-38, 200-01.  Countryman told Smasal of her blood sugar drop and went to get something to drink.  Id. at 37.  Approximately fifteen minutes later, Smasal walked by Countryman, who was resting in the back room, and asked Countryman if she was ready to work yet, without asking Countryman if she was feeling better.  Id. at 37-39.  Later that day, Countryman spoke with Casey Saeger ("Saeger") in Human Resources, told Saeger about her insulin low, and asked to be switched to a larger department such as Lingerie so that she could work with someone else at all times.  Id. at 37, 200-02; Saeger Dep. (Flom Aff.) at 11-13; Flom Aff. Ex. 6.  At that time, there were no openings in the Lingerie Department.  Countryman Dep. at 196-97, 210-11, 215.  At her deposition, Saeger testified that after meeting with Countryman, she did not follow up with the concerns raised by Countryman, concluding that it "would be [Countryman's] responsibility" to pursue a transfer.  Saeger Dep. at 13, 33.

Also in August 2004, Smasal told Countryman that employees in the nearby Handbags and Accessories Departments had complained that Countryman was taking too many breaks and that her breaks were too long.  Countryman Dep. at 28, 36, 56.  Countryman had noticed that one employee in particular had been rolling her eyes or acting irritated and disapproving when Countryman asked her to cover the Hosiery Department so that Countryman could use the

bathroom. Id. at 27, 35, 41, 54-56, 198-99. Smasal told Countryman to try to limit the number of times she asked people to watch her department. Id. at 28. Countryman denied abusing her breaks and stated that she had to use the bathroom to wash her hands and test her blood sugar. Id. at 28, 35-36. After this conversation with Smasal, Countryman felt very uncomfortable asking people in other departments to cover for her. Id. at 57-58.

In early September, Countryman learned there would be an opening in the Handbags Department. Id. at 215. Countryman was interested in transferring to the Handbags Department because, among other reasons, it had a larger staff than the Hosiery Department. Id. at 216. Countryman talked to Jennifer Rand ("Rand"), the manager of the Handbags Department, about a possible transfer. Id. at 220, 253; Countryman Aff. ¶ 13; Rand Dep. (Flom Aff.) at 17-18. Rand told Countryman to talk to Smasal about the transfer, and that a transfer would depend on Smasal's recommendation and approval from the store manager. Countryman Dep. at 220, 253; Countryman Aff. ¶ 13; Rand Dep. at 17-18. Rand spoke with Smasal, and told Smasal that she was not interested in having Countryman working in the Handbags Department in part because Rand's employees had also complained to Rand about Countryman taking excessive breaks. Rand Dep. at 18-26; Smasal Dep. at 42-43, 70. At her deposition, Rand testified that Countryman's "frequent breaks" were not "something that I would be able to have in my department. I needed someone who would be on the sales floor except for their allotted break that they would get." Rand Dep. at 21-22. Smasal told Rand that she would "take care of it." Id. at 19; see Smasal Dep. at 70.

On September 16, 2004, Smasal met with Countryman to give her an "Opportunity Check," Nordstrom's version of a written employment warning. Countryman Dep. at 18, 127-

5

28; Smasal Dep. at 16; Flom Aff. Ex. 4.  Smasal explained to Countryman that she was receiving an Opportunity Check for taking excessive breaks and being gone too long on her breaks. Countryman Dep. at 136-37; Flom Aff. Ex. 4.  Other employees had reported to Smasal that Countryman was smoking or socializing on her breaks rather than taking care of her diabetes. Countryman Dep. at 138-40, 225-26; Riley Dep. (Flom Aff.) at 25-30, 37-40.  Smasal testified that she had not directly witnessed Countryman abuse her use of medical breaks.[4]  Smasal Dep. at 39-41, 57-64.  Countryman denied abusing her breaks and told Smasal that she was attending to her diabetes on her breaks.  Countryman Dep. at 18, 139-41, 222.  Countryman also told Smasal that she was interested in transferring to the Handbags Department.  Id. at 220.  Smasal told Countryman that if she did try to transfer to another department, Smasal would be forced to tell the manager of that department that Countryman had an absenteeism problem.  Id. at 220, 222, 252-53; see Smasal Dep. at 70, 79-80.[5]  Countryman decided that if she could not transfer departments and could not continue taking breaks when she needed them, she would have to leave Nordstrom.  Countryman Dep. at 222-25, 254-55.

Countryman went to Human Resources and spoke with Shadron.  Id. at 19, 228, 255; Shadron Dep. at 30.  She told Shadron that she was very upset, that she had not been abusing her breaks, and that she felt like she had to leave the company.  Countryman Dep. at 19, 228-29, 255; Shadron Dep. at 30-31.  Shadron told Countryman to go home for the rest of the day, think

---

[4] At her deposition, Smasal testified that she witnessed Countryman getting coffee "[a]t least four times."  Smasal Dep. at 37-39.

[5] Smasal avers that she told Countryman that she would not recommend Countryman's transfer to the Handbags Department until she saw improvement in the area of excessive breaks. Smasal Dep. at 79-80

6

it over, and call her tomorrow. Countryman Dep. at 19, 233, 255; Shadron Dep. at 30-31. When Countryman told Shadron about her desire to transfer departments, Shadron said, "Well, Jennifer, I can't always guarantee that people are going to be nice and accommodating to you." Countryman Dep. at 230. Countryman then went back to the Hosiery Department to tell Smasal that she was quitting Nordstrom. Id. at 19, 231-32, 256; Smasal Dep. at 79. Smasal said, "That's not what I wanted," which Countryman interpreted to mean Smasal did not want Countryman to leave Nordstrom. Countryman Dep. at 256. Countryman called Human Resources the next day and spoke to Saeger. Id. at 20, 232, 257; Shadron Dep. at 37. Countryman informed Saeger that she would not be coming back to Nordstrom. Countryman Dep. at 20, 232, 257.

Countryman was able to find other employment after leaving Nordstrom. Id. at 68-69. In August 2005, Countryman had an insulin pump device implanted in her body. Id. at 104-05. The insulin pump allows for automatic implantation of insulin into Countryman's body every hour, with minimal intervention from Countryman to make the insulin pump work. Id.

### III. DISCUSSION

A.   **Summary Judgment Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for

summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Disability Discrimination**

The ADA and MHRA prohibit discrimination in employment on the basis of disability. 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2. To proceed on a cognizable disability discrimination claim, Countryman must first establish a *prima facie* case of discrimination by showing that "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) she suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability." Heisler v. Metro. Council, 339 F.3d 622, 626-27 (8th Cir. 2003). If Countryman establishes a *prima facie* case, the burden of production shifts to Nordstrom to articulate a legitimate, nondiscriminatory reason for its actions. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999). Once Nordstrom has done so, the burden shifts back to Countryman to present evidence that Nordstrom's legitimate nondiscriminatory reason is mere pretext. Id. The MHRA generally parallels the ADA, and consequently, claims under the ADA and MHRA are analyzed with the same standard. Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784, 788 (8th Cir. 2004); Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 711 n.5 (8th Cir. 2003).

    **1.      Disability**

To be disabled under the ADA, an individual must (1) have a physical or mental

impairment that substantially limits one or more major life activities; (2) have a record of such an impairment; or (3) be regarded as having such an impairment. 42 U.S.C. § 12102(2). The MHRA similarly defines disability, except the word "materially" is substituted for the word "substantially." Minn. Stat. § 363A.03, subd. 12.

Agency regulations that interpret the ADA define "substantially limits" as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1); Ristrom v. Asbestos Workers Local 34 Joint Apprentice Committee, 370 F.3d 763, 769 (8th Cir. 2004). The Supreme Court defines "substantially" to mean "'considerable' or 'to a large degree.'" Toyota Motor Mfg. v. Williams, 534 U.S. 184, 196 (2002). Factors to consider in determining whether an individual is substantially limited in a major life activity are "(1) [t]he nature and severity of the impairment; (2) [t]he duration or expected duration of the impairment; and (3) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); Heisler, 339 F.3d at 627.

Agency regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Supreme Court defines "major life activities" as "those activities that are of central importance to daily life." Toyota, 534 U.S. at 197. Whether or not an individual is disabled is determined on a case-by-case basis. Id. at 198. The effects of any mitigating

measures utilized by the individual must also be taken into account. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).

Nordstrom argues that Countryman was not disabled because she was not materially or substantially impaired in a major life activity. Nordstrom argues that Countryman's infrequent and short-lived insulin attacks do not rise to the level of a disability. Nordstrom further argues that Countryman's other limitations arising from being a diabetic do not constitute material or substantial impairments because Countryman has been able to maintain a job, and her problems sleeping, eating, cooking, and tiring easily are not significantly different from those of the population in general. Countryman responds that she is substantially limited in performing the major life activities of eating, sleeping, walking, speaking, standing, thinking, interacting with others, and caring for herself. Countryman alleges that because of her diabetes at the time of her Nordstrom employment, she had to take frequent breaks to test her blood sugar levels, had to closely watch what she ate, always be near food and drink, and try to eat on a very regular schedule.

Countryman has proffered sufficient facts to create a genuine issue of material fact as to whether she was disabled while a Nordstrom employee. It appears from testimony that Countryman currently has fairly good control of her diabetes, two years after her initial diagnosis and after the implantation of an insulin pump in her body. Countryman Dep. at 104-05, 159. However, the relevant time period for this dispute is the summer and fall of 2004, when Countryman was first diagnosed with and learning to control her diabetes. During that time period, Countryman had to take frequent breaks to test her blood sugar, use the bathroom, get something to eat or drink, and rest. At her deposition, Countryman testified that she had insulin

10

attacks once a week or once every two weeks, which would disable her for fifteen to thirty minutes at a time. Countryman recalls one insulin reaction at work in which her hands were shaking, she was panicking, and she may have "exploded on" a customer. Countryman testified that insulin attacks affected her ability to walk, stand, speak, think, and interact with others.

Because Countryman's insulin attacks were sporadic and relatively short in duration, her insulin attacks alone do not render her disabled. See Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 724 (8th Cir. 2002) ("Health conditions that cause moderate limitations on major life activities do not constitute disabilities under the ADA."); Zirpel v. Toshiba Am. Info. Sys., Inc., 111 F.3d 80, 81 (8th Cir. 1997) (holding plaintiff not disabled where plaintiff's ability to speak and breathe was hampered during panic attacks, which could be infrequent and mild, but panic disorder did not otherwise usually limit plaintiff's activities). However, diabetes is a life-long condition, and at the time of Countryman's final months of employment with Nordstrom, Countryman was a recently diagnosed diabetic struggling to control her diabetes. During this time period, Countryman did not yet have an implanted insulin pump and was trying to determine the correct dosage of insulin. She had to carefully watch what she ate, test her blood sugar frequently, and if she was low, she would have to eat or drink something with sugar right away and then wait to make sure her blood sugar was elevated. Considering all of the facts in the light most favorable to Countryman, Countryman has created a genuine issue of material fact as to whether she was materially or substantially limited in the major life activities of eating and caring for herself at the time of her employment with Nordstrom. See Lawson v. CSX Transp., Inc., 245 F.3d 916, 926 (7th Cir. 2001) (holding that a jury could find that the prescribed treatment the plaintiff had to control diabetes causes symptoms that substantially limit the major

life activity of eating).[6]

## 2. Adverse Employment Action

"Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." Tatum v. Ark. Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1159 (8th Cir. 1999). A plaintiff can establish her employer's intent "by showing [her] resignation was a reasonably foreseeable consequence of [her] employer['s] discriminatory actions." Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 858 (8th Cir. 1998). "[I]ntolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998). "The employee must show that a reasonable person in her situation would find the working conditions intolerable." Gartman v. Gencorp Inc., 120 F.3d 127, 130 (8th Cir. 1997). "An employee must give an employer a reasonable opportunity to work out a problem before quitting." Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997).

Nordstrom argues that Countryman did not suffer a constructive discharge and thus suffered no adverse employment action because no reasonable person would find the September 16, 2004 reprimand so intolerable as to force her to quit. Nordstrom further argues that Countryman quit without giving Nordstrom an opportunity to fix the problem. Also, Nordstrom

---

[6] The parties agree Countryman was qualified to perform the essential functions of her job at Nordstrom.

argues that Countryman can not show that Nordstrom intended for her to quit since Shadron told Countryman to take the day off and think about whether she really wanted to resign, and Smasal said, after being told Countryman was quitting, "That's not what I wanted."

Countryman argues that she has alleged facts to establish constructive discharge. During the summer and fall of 2004, Countryman was a newly diagnosed diabetic who needed to test her blood sugar often and was just learning how to care for her diabetes. Countryman argues that Smasal's actions led Countryman to believe that she would no longer be able to take frequent breaks and would be unable to transfer to a larger department. Additionally, the Human Resources Department did nothing to assist her in finding an appropriate accommodation. Countryman claims that if she did not leave Nordstrom, she risked serious health problems by not being able to take the breaks that she needed to monitor her diabetes.

Countryman has alleged sufficient facts to create a genuine issue of material fact for trial. Viewing the evidence in the light most favorable to Countryman, a reasonable person could conclude that restricting the ability of a newly diagnosed diabetic to take frequent breaks to test her blood sugar and prevent or treat insulin attacks which could result in serious health problems, constitutes intolerable working conditions. Countryman's quitting was also a reasonably foreseeable consequence of Smasal's disciplining Countryman for taking frequent breaks. Smasal gave Countryman the written employment warning after hearing from other store managers that Countryman was abusing her breaks, without investigating herself whether the allegations were true. When Countryman protested and insisted that her breaks were medically necessary, Smasal did not withdraw the reprimand. This occurred after a previous verbal warning that Countryman was taking excessive breaks. Also, Smasal essentially rejected

a request from Countryman to transfer to a larger department to facilitate her ability to take breaks. Countryman was also told to try to limit the number of times she asked other employees to cover for her. Because issues of fact for a jury remain, Nordstrom's Motion for Summary Judgment must be denied.

### 3. Legitimate, Nondiscriminatory Reason and Pretext[7]

Nordstrom has identified a legitimate, nondiscriminatory reason for its warning and "Opportunity Check" for Countryman—Smasal believed, based on reports from individuals she never identified, that Countryman was using her breaks to smoke and socialize rather than take care of medical needs. Countryman responds that Nordstrom's legitimate, nondiscriminatory reason is mere pretext. Countryman avers that Smasal never witnessed Countryman during her breaks, except for a few times that Smasal saw Countryman getting coffee, which could have been to treat an insulin attack or could have been one of her regular fifteen-minute breaks. Countryman further avers that Smasal relied on secondhand reports of Countryman abusing her medical breaks without conducting any type of investigation or inquiring as to which employees were complaining that Countryman was taking excessive breaks. Nordstrom responds that even if Smasal's belief that Countryman was abusing her breaks was wrong, it is still not evidence of pretext. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1112 (8th Cir. 2001) ("We have previously held that reliance on an honest yet incorrect belief is not evidence of

---

[7] Because issues of material fact remain as to whether Countryman has established a *prima facie* case of disability, the Court need not conduct the remainder of the McDonnell Douglas burden shifting analysis at this time. Choosing instead to focus on aspects of the *prima facie* case, the parties devoted only a small portion of their briefs to the burden shifting analysis. However, to assist the furthering of this litigation, the Court will briefly address the remainder of the burden shifting analysis.

pretext."). However, the proper inquiry in this case is whether Smasal honestly believed that Countryman was abusing her breaks or whether she found the medical breaks to be annoying to her responsibilities as a manger and used break "abuse" as a pretext. See Johnson v. AT&T Corp., 422 F.3d 756, 762 (8th Cir. 2005). Countryman has raised material issues of fact to allow a jury to decide whether the real reason for Nordstrom's actions was occasioned by Countryman's disability. Id. at 763.

**C.     Failure to Accommodate**

The ADA and MHRA both require an employer to make reasonable accommodation to the known physical or mental limitations of a qualified disabled person unless the accommodation would impose an undue hardship on the employer. See 42 U.S.C. § 12112(b)(5)(A); Minn. Stat. § 363A.08, subd. 6. To establish a failure to accommodate claim, Countryman must "show that h[er] employer knew of, and failed to reasonably accommodate, h[er] disability." Kammueller, 383 F.3d at 784. Nordstrom argues that because Countryman was not disabled, she was not entitled to any accommodation. In the alternative, Nordstrom argues that it did accommodate Countryman. Nordstrom avers that it allowed Countryman to take frequent breaks, hired additional employees, and rearranged Countryman's schedule. Also, Nordstrom argues that its failure to transfer Countryman to a larger department can not be a failure to accommodate because as long as the accommodation it provides is effective, an employee does not have a right to choose her own accommodation. See Kiel, 169 F.3d at 1137 ("If more than one accommodation would allow the individual to perform the essential functions of the position, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations."). Countryman argues that by disciplining her for taking

breaks, Nordstrom effectively retracted the reasonable accommodation it provided. Countryman further argues that a transfer to the Handbags Department would have been an effective reasonable accommodation, but Nordstrom essentially denied such a transfer when Smasal told Countryman that she would have to tell the prospective new manager that Countryman had a problem with taking excessive breaks. Countryman also argues that Nordstrom failed to engage in an interactive process.

Summary judgment is precluded on Countryman's failure to accommodate claims because material issues of fact remain. Although Nordstrom did provide Countryman an accommodation by allowing her to take frequent breaks, a question remains as to whether that accommodation was effective, since several employees complained about having to cover for Countryman, which led to Countryman being disciplined for taking excessive breaks. While employers are not required to create new positions as an accommodation, reassignment to a vacant position can be a reasonable accommodation, and "in certain circumstances, reassignment may be necessary as a reasonable accommodation." Cravens v. Blue Cross & Blue Shield of Kan. City, 214 F.3d 1011, 1018 (8th Cir. 2000). Countryman was working in the small Hosiery Department and often worked alone, which required her to ask employees from neighboring departments to cover for her while she took breaks. While some employees complained that Countryman was not using her breaks for medical purposes, other employees complained more generally that Countryman's breaks were excessive or too long. Given the facts that transfer of Countryman to an open position in a larger department was a possible option, a jury could find that Nordstrom's chosen accommodation was neither effective nor reasonable.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Nordstrom, Inc.'s Motion for Summary Judgment [Docket No. 15] is **DENIED**.

BY THE COURT:


      s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: January 5, 2007.